# United States Court of Appeals
## For the First Circuit

Nos. 12-1853
    12-1864

JEREMY M. WEISS,

Appellee/Cross-Appellant,

v.

DHL EXPRESS, INC.,

Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Stahl, and Thompson,
Circuit Judges.

Richard B. Lapp, with whom Camille A. Olson, Kristin G. McGurn, Jeffrey M. Burns and Seyfarth Shaw LLP were on brief, for appellant.

Paul F. Kelly, with whom Segal Roitman, LLP was on brief, for appellee.

June 3, 2013

HOWARD, Circuit Judge. Jeremy Weiss was a rising star at DHL Express, Inc. ("DHL") until his termination in September 2009, ostensibly for his failure to properly investigate, document, and ameliorate the misconduct of an employee under his supervision. The termination occurred just months before Weiss was to receive a $60,000 bonus. Weiss filed suit in Massachusetts state court to recover the bonus on the grounds that he was terminated without good cause, which under the terms of the bonus plan entitled him to a full payout. He asserted breach of the implied covenant of good faith and fair dealing, detrimental reliance, unjust enrichment, and violation of the Massachusetts Wage Act. DHL removed the case to federal court on diversity grounds. The court allowed a single cause of action to go to the jury--a "straightforward" breach-of-contract claim. The jury found for Weiss. DHL's main claim on appeal is that the court erroneously allowed the jury to independently determine whether good cause existed for Weiss's termination because the bonus plan reserved this determination for a committee of the company. In his cross-appeal, Weiss challenges the grant of summary judgment to DHL on his Wage Act claim and the denial of his attorney's fees. We reverse the jury verdict and affirm the summary judgment order.

## I.

The relevant facts are undisputed. In 2004, DHL, an international express mail services company, acquired Airborne

Express, a package delivery company operating in the United States. Weiss, who had been employed at Airborne Express since 1996, continued his employment at DHL as District Sales Manager for downtown Boston. He was promoted within a year to the post of Regional Sales Director in charge of overseeing a number of sales districts in the Northeast, including Brooklyn, New York. The following year, DHL named him "Regional Sales Director of the Year." Weiss was then elevated to the position of Director of National Accounts in August 2007. He remained in that position until his termination two years later.

A. The Bonus Plan

In December 2007, DHL informed Weiss that it had selected him to participate in the company's "Commitment to Success Bonus Plan" (the "Plan"). Under the Plan, Weiss became eligible for a $60,000 service-based bonus if he remained with the company through the end of 2009, and a $20,000 bonus if DHL met its performance objectives in 2009. The Employment Benefits Committee (the "Committee") of the company was given broad authority to administer the Plan:

> The Committee shall have full power and discretionary authority to interpret the Plan, make factual determinations, and to prescribe, amend and rescind any rules . . . and to make any other determinations and take such other actions as the Committee deems necessary or advisable in carrying out its duties under the Plan. Any action required of the Committee under the Plan shall be made in the Committee's sole discretion and not in a fiduciary capacity and need not be uniform as to similarly situated individuals. The Committee's

administration of the Plan, including all such rules and regulations, interpretations, selections, determinations, approvals, decisions, delegations, amendments, terminations and other actions, shall be final, conclusive and binding on the Company, the Participant, and any other persons having or claiming an interest hereunder.

The Committee could delegate its functions to a subcommittee or to one or more individuals. It also reserved the right to amend or terminate the Plan.

In October 2008, Weiss received notice that "some adjustments to the Plan" were made "in order to better reflect our changing work environment." Under the amended Plan, Weiss was still eligible to receive $80,000, but no portion of it was tied to the company's performance. Instead, the entire bonus was now contingent on continued employment through the end of 2009, with Weiss's performance remaining "in good standing." The first installation of $20,000 was payable in January 2009 and the remaining $60,000 in January 2010. In the event that DHL terminated him "without cause" and eliminated his position, Weiss would receive the full payout upon termination. If he voluntarily left DHL or if terminated for "good cause" prior to the payment dates, he would be ineligible for the bonus.

DHL paid Weiss the first installment of the bonus in January 2009. When he was terminated in September 2009, DHL refused to pay the remaining $60,000 on the basis that his termination was for good cause.

-4-

B. The Termination

In 2007, while Weiss was still Regional Sales Director, DHL shifted the Brooklyn district to another Regional Sales Director, Christopher Cadigan. Following the organizational change, Cadigan informed Weiss that Sergio Garcia, a sales representative in Brooklyn, had incorrectly set up rates on a customer account. Weiss and Cadigan discussed the billing issue with their boss, Vice President of Sales David Katz, and Garcia's supervisor, District Sales Manager Michael Gargiles. They agreed that Cadigan would work with Garcia to fix the issue. Although he no longer had oversight over Garcia, Weiss was in the Brooklyn area on other business and offered to speak to him.

At that meeting, which Gargiles also attended, Weiss warned Garcia that his conduct could result in disciplinary action, including termination. He also instructed Garcia to work with the pricing team to correct the billing issue. Weiss followed up with Katz and Cadigan, informing them of his warning to Garcia. Although the company handbook for managers provided that verbal warnings must be documented, Weiss was unaware of the policy. Neither he nor Gargiles documented the warning to Garcia, nor did they inform the human resources department of the warning.

Several months later, Cadigan received a customer complaint regarding one of its competitors receiving "shockingly low" DHL rates. Cadigan conducted an investigation and found that

several sales representatives in Brooklyn had extended unauthorized rates to certain customers by circumventing company procedures. He reported this to Vice President of Sales Jonathan Routledge (apparently Katz's successor). Routledge and Cadigan interviewed a group of six representatives, including Garcia, about using so-called "rogue" rates. Three representatives resigned rather than face disciplinary action. As there was no concrete evidence linking Garcia to the dishonest activities, he only received a three-day suspension (which the human resources department apparently rescinded as unauthorized) and then was transferred to the sales district in Long Island. Weiss, who at this time was Director of National Accounts, was involved neither in Cadigan's investigation nor in the decision to discipline Garcia.

The unauthorized practice of selling "rogue" rates continued in the New York area. In October 2008, the company's loss prevention department launched an investigation into the matter and discovered that the scheme had resulted in a multimillion-dollar loss to DHL in 2008 alone. During the course of the investigation, Fraud Manager Scott Kamlet interviewed Cadigan and Routledge and learned about their 2007 investigation of the very same issue. He then gathered information implicating Garcia in the unauthorized practice and attempted to interview him. After Garcia refused to cooperate, Kamlet recommended that he be terminated. In his recommendation, Kamlet stated that Garcia had

received a verbal warning from Weiss in 2007 for similar unauthorized actions and that it was Kamlet's belief that Garcia's supervisors did not know the extent of Garcia's misconduct at the time of this warning.

Kamlet's recommendation apparently was not enough for Garcia to lose his job. In April 2009, Weiss received a customer complaint alleging that Garcia was asking customers to pay kickbacks in exchange for receiving preferential shipping rates. The customer threatened to go public with the information. Weiss immediately forwarded the complaint to his superiors. A few days later, Garcia resigned.

DHL responded to the allegation by retaining attorney Kenneth Thompson to conduct an investigation. In addition to confirming the kickbacks allegation, Thompson also found that Garcia and several other representatives in Brooklyn had engaged in various improper sales practices during the preceding years, including while Weiss was in charge of the district. Specifically, Thompson reported that the billing issue that precipitated Weiss's verbal warning to Garcia involved an unauthorized shipping rate extension. Thompson informed DHL of Weiss's "management failures" relating to his oversight of Garcia, including his failure to properly discipline Garcia in 2007, to document the 2007 verbal warning, to consult the human resources and security departments

about the verbal warning, and to further investigate Garcia's conduct to determine of the scope of the misconduct.

At the conclusion of the investigation, Michael Berger, Weiss's supervisor at the time, informed Weiss that DHL was terminating his employment. The termination letter stated that Weiss was terminated for "just cause" because the results of the Thompson investigation "present[ed] a picture of significant management failures" while Weiss was Regional Sales Director in charge of the Brooklyn district "and thereafter." Berger was unaware of those failures until the Thompson investigation. When Weiss asked who made the decision to fire him, Berger told him, "it's above me."

Upon termination, Weiss did not receive the $60,000 bonus that he was set to receive in four months. DHL's General Counsel John Olin, who was the head of the Committee in charge of administering the Plan, testified that this was because Weiss was terminated for "good cause," which under the terms of the Plan made him ineligible for the bonus.

C. The Court Proceedings

Weiss sued DHL over the unpaid bonus, alleging that he was entitled to payment because his termination was without good cause.[1] He asserted four claims for relief: (1) non-payment of

_____

[1] Weiss also sought six-months' severance pay. On appeal, he does not press any claims related to the severance pay.

wages in violation of the Massachusetts Wage Act, see Mass. Gen. Laws ch. 149, § 148; (2) violation of the implied covenant of good faith and fair dealing; (3) detrimental reliance; and (4) unjust enrichment.  The district court granted DHL's motion for summary judgment on the Wage Act claim, ruling that the bonus was not "wages" within the meaning of the Act.

After Weiss presented his evidence at trial, the court announced that only a "straightforward" breach-of-contract claim would go to the jury.[2]  The court then directed a verdict in favor of DHL on the remaining claims.  Weiss did not object to the recasting of his contract claim or the directed verdict, and he does not challenge either that action or the directed verdict on appeal.

The court instructed the jury that the key issue was whether Weiss was terminated without "good cause" because, if so, DHL breached the Plan by not paying him the bonus.  DHL objected on the ground that the Plan reserved the good cause determination for the Committee.  The court acknowledged that the Plan "has the language in it" reserving for the Committee decisions "about

---

[2] The parties dispute whether the district court converted the good faith and fair dealing claim or the detrimental reliance claim into the breach-of-contract claim.  The court indicated at one point that it was treating Weiss's detrimental reliance claim as a claim for breach of contract, and it later stated that "subsumed within the good faith and fair dealing claim is the breach-of-contract claim."  The issue is of no consequence to our disposition of this appeal.

performance and the like."  But because the Plan uses the words "good cause," the court explained, it was for the jury to decide whether the termination was without good cause, regardless of the Committee's nomenclature.  So instructed, the jury found for Weiss.  After the court denied DHL's motion for judgment as a matter of law without comment, DHL filed this timely appeal.

**II.**

## A.  The Breach-of-Contract Claim

DHL maintains that the Plan gives the Committee the sole and exclusive authority to determine whether good cause existed for a participant's termination, and that in this instance the Committee so determined.  Accordingly, DHL argues, it is entitled to judgment as a matter of law because there could be no breach of contract under the undisputed facts.  Weiss retorts that it was for the jury to decide whether Weiss's termination was for good cause because the Plan is ambiguous as to whether the Committee retained such authority.

It is unclear from the record whether the district court agreed that the Plan is ambiguous in this regard.  In any event, the court submitted the good cause determination to the jury and denied DHL's Rule 50 motions.  Our review of a denial of a Rule 50 motion for judgment as a matter of law is de novo.  Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004).

-10-

We begin by reviewing long-standing principles of contract law.[3]  Interpretation of a contract is ordinarily a question of law for the court.  Seaco Ins. Co. v. Barbosa, 761 N.E.2d 946, 951 (Mass. 2002).  "[W]hen several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together."  FDIC v. Singh, 977 F.2d 18, 21 (1st Cir. 1992).  Absent an ambiguity, the court interprets a contract "according to its plain terms," Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 52 (1st Cir. 1996), in a manner that gives reasonable effect to each of its provisions, J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986).

"A contract is not ambiguous simply because litigants disagree about its proper interpretation."  Singh, 977 F.2d at 22.  Ambiguity arises only if the language "is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  S. Union Co. v. Dep't of Pub.

---

[3] Both parties cite Massachusetts law as governing the interpretation of the Plan, even though the Plan's choice-of-law provision states that it is to be construed in accordance with Florida law.  "Generally, where the parties ignore choice of law issues on appeal, we indulge their assumption that a particular jurisdiction's law applies."  New Ponce Shopping Ctr., S.E. v. Integrand Assurance Co., 86 F.3d 265, 267 (1st Cir. 1996); see Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011). In any event, the result would not vary even if Florida law were controlling, as we construe the Plan using general principles of contract law.

Utils., 941 N.E.2d 633, 640 (Mass. 2011) (internal quotation marks omitted).  There is no ambiguity in the instant contract.

The plain language of the Plan designates the Committee as the sole arbiter of whether a Plan participant is terminated for good cause.  The original Plan document makes clear that it is for the Committee to determine bonus eligibility and to construe the Plan's terms.  The Plan specifies that the Committee "shall have full power and discretionary authority" to make determinations under the Plan and that its decisions regarding "rules and regulations, interpretations, selections, determinations, approvals, decisions, delegations, amendments, terminations and other actions, shall be final, conclusive and binding."  In short, as the Plan administrator, the Committee was given broad discretionary authority to determine all matters pertaining to the Plan, including whether a participant qualified for payment.

The amendment to the Plan neither trumps the Committee's sweeping authority nor creates an ambiguity in this regard.  By its express terms, the amendment only made "some adjustments" to the Plan, namely to provide that the bonus was no longer tied to the company's performance but only to continued service and to permit a participant terminated without good cause to receive the payout. The amendment did not purport to modify the Committee's role in any way.  Because the modifications were not "so material and so extensive" as to establish a substitute contract, the terms of the

-12-

original Plan document that were not expressly modified remain in effect. <u>Kirkley</u> v. <u>F.H. Roberts Co.</u>, 167 N.E. 289, 290 (Mass. 1929); <u>see</u> <u>McKinley Invs., Inc.</u> v. <u>Middleborough Land, LLC</u>, 818 N.E.2d 627, 629 (Mass. App. Ct. 2004). Interpreting the original Plan document and the amendment as a single agreement, as we must, it becomes plain that the contract is susceptible only to one plausible construction: whether Weiss was terminated without good cause and thus remained eligible for the bonus was a decision within the ambit of the Committee's sole and final decision-making authority.

Weiss argues that the Plan is ambiguous because the amendment provides for the good cause determination but is silent about who decides, whereas the original Plan document addresses the Committee's decision-making authority but not the good cause protection. According to Weiss, this "tension" between the two documents could plausibly suggest that the employer and not the Committee is to determine whether a participant is terminated for good cause, in which case the jury could review the employer's decision. We disagree. The provision designating the Committee as the sole and final authority on decisions of this type is broad enough to encompass the good cause determination. And nothing in the amendment suggests that someone other than the Committee would make such decisions. Hence, the two documents are not incongruous. The only plausible construction of the Plan as a whole that gives

-13-

reasonable effect to the provisions in both writings is that the Committee's decision-making authority extends to this eligibility determination.

Simply put, under the Plan, the Committee was free to deny Weiss the bonus if, in its sole judgment, his employment was terminated for good cause.  Cf. Nolan v. CN8, 656 F.3d 71, 82 (1st Cir. 2011) (Selya, J., concurring) (where the employment agreement designated the employer as "the sole arbiter of whether the plaintiff's actions reflected unfavorably on [the employer's] interests or reputation (and, thus, warranted termination)," the plaintiff's contractual right to continued employment was extinguished when the employer exercised its prerogative).  Neither we nor the district court can rewrite the contract to take away the Committee's discretion and empower the jury to decide whether Weiss was terminated for good cause.

The only relevant question regarding Weiss's breach-of-contract claim, then, is whether the Committee determined that Weiss was terminated for good cause.  There is no room to doubt that it did so.[4]  Olin, the head of the Committee, testified

---

[4] The district judge acknowledged as much when DHL moved for judgment as a matter of law at the close of the evidence, stating, "if I were to give [the contract] language full force and effect, I'll say this on the record, [DHL] should get judgment as a matter of law because [its] people have been clear that in their judgment" there was good cause to terminate Weiss.  It is unclear from the record why the judge decided not to give effect to the contract language.

unrebutted that, as permitted under the Plan, the Committee delegated to DHL's management its authority to determine whether good cause existed for a Plan participant's termination. DHL's executives testified, again unrebutted, that they decided to terminate Weiss because of his management failures in overseeing Garcia.

That effectively ends the matter. The Committee's determination that Weiss was terminated for good cause made him ineligible for the bonus, precluding his breach-of-contract claim. Accordingly, we reverse the judgment against DHL.[5]

This outcome is not unfair, as Weiss urges. Weiss was a handsomely compensated employee in a significant position at DHL. He accepted the terms of the Plan that gave the Committee unfettered discretion in matters such as the eligibility decision at issue here. The preclusion of his breach-of-contract claim, moreover, does not mean that Weiss had no recourse but to bow his head and accept the Committee's decision. As Weiss recognized early in the game, Massachusetts law implies in every contract a covenant of good faith and fair dealing. Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005). A party may breach

---

[5] Given our disposition, we need not address Weiss's claim that the district court erred in denying his motion for attorney's fees and expenses. Nor do we reach DHL's alternative arguments that there was insufficient evidence to support the jury verdict and that the court's mid-trial claim conversion was unfairly prejudicial.

the covenant without breaching any express term of the contract. See Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1255-56 (Mass. 1977). In his complaint, Weiss asserted a claim for breach of the covenant. We pass no judgment on the viability of the claim, however, because it is not before us. When the district court discarded the good faith and fair dealing claim, leaving only a "straightforward" breach-of-contract claim, Weiss did not object. And he does not argue on appeal that the covenant claim remains. We therefore have no choice but to conclude that Weiss has abandoned the claim.[6] See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## B. The Wage Act Claim

In his cross-appeal, Weiss challenges the grant of summary judgment to DHL on his claim under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148. He assigns error to the district court's ruling that the bonus at issue did not constitute "wages" under the Act. We review the grant of a motion for summary judgment de novo, taking the record evidence in the light most favorable to Weiss as the nonmoving party and drawing all reasonable inferences in his favor. Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 217 (1st Cir. 2008).

---

[6] Even if the district court converted the detrimental reliance claim and not the covenant claim, the outcome remains the same. The district court directed a verdict in DHL's favor on all remaining claims, an order that Weiss does not appeal.

-16-

The Wage Act requires prompt payment of "wages earned" on pain of civil and criminal penalties, treble damages, and attorney's fees. Mass. Gen. Laws ch. 149, §§ 148, 150. While the Act makes clear on its face that holiday pay, vacation pay, and definitely determined commissions fall within its protections, the term "wages" is not otherwise defined. Id. § 148. In refusing to adopt a broad definition of wages covered under the Act, Massachusetts courts speak of the Act's purpose--"to prevent the unreasonable detention of wages." Bos. Police Patrolmen's Ass'n, Inc. v. City of Bos., 761 N.E.2d 479, 481 (Mass. 2002); see Weems v. Citigroup Inc., 900 N.E.2d 89, 94 n.10 (Mass. 2009) (distinguishing the narrow purpose of the Wage Act from broader remedial statutes like the state Equal Pay Act, where the term "wages" has been interpreted as encompassing all potential sources of pay). In keeping with this narrow purpose, courts have held that various forms of compensation fall outside of the scope of the Wage Act. See Weems, 900 N.E.2d at 94 (discretionary stock bonus contingent on continued employment until vesting period not covered by the Act); Bos. Police, 761 N.E.2d at 481 (contributions to deferred compensation plans outside of the scope of the Act); Prozinski v. Ne. Real Estate Servs., LLC, 797 N.E.2d 415, 419-21 (Mass. App. Ct. 2003) (severance pay not "wages" under the Act).

The Weems decision is particularly instructive. The certified question before the Supreme Judicial Court was whether a

bonus paid in form of restricted stock was covered by the Wage Act. The bonus was discretionary and an employee who received it would forfeit the award in the event of termination, either voluntary or for cause, prior to the vesting date. Weems, 900 N.E.2d at 94. The court seized on the fact that the bonus "was not only discretionary, but it also had an important contingency attached to it"--the recipient's continued employment. Id. Thus, those recipients who left their employ prior to the vesting date were not deprived of "wages" within the meaning of the Wage Act. See id.

Like the unvested shares of stock in Weems, the bonus in Weiss's case was contingent on either continued employment, with his performance remaining in good standing, or the Committee's determination that his termination was without good cause. The Committee determined, in its sole discretion, that Weiss was terminated for good cause prior to the payment date. The bonus was therefore never "earned" because neither contingency occurred. Because DHL was under no obligation to pay the bonus, Weiss was not deprived of wages that he earned. We affirm the grant of summary judgment in DHL's favor.

## III.

For the aforementioned reasons, we reverse the judgment for Weiss on the breach-of-contract claim and remand for entry of judgment in DHL's favor. We affirm the grant of summary judgment to DHL on the Wage Act claim.

-18-